502 F.2d 1326
 James ROWLEY and John H. Grimes, Jr., Petitioners,
v.
Honorable James B. McMILLAN, Judge of the United States
District Court for the Western District of North
Carolina, Charlotte Division, et al.,
Respondents.
Marvin Ray SPARROW et al., Appellees,
v.
J. C. GOODMAN, Jr., Chief of Police of Charlotte, N.C., et
al., Defendants, James Rowley, Director of the U.S. Secret
Service, and John H. Grimes, Jr., Agent of the U.S. Secret
Service, Appellants, And divers other Secret Service Agents,
et al., Defendants.
 Nos. 73-2451, 73-2454.
 United States Court of Appeals, Fourth Circuit.
 Argued April 1, 1974.
Decided July 26, 1974.
 
 James E. Walker and Robert G. McClure, Jr., Charlotte, N.C. (Sanders, Walker & London, Charlotte, N.C., on brief), for petitioners in No. 73-2451.
 George S. Daly, Jr., Charlotte, N.C. (Frank Aycock, Charles Lloyd, Asst. Attys. Gen. of N.C., William A. Watts, Asst. City Atty., Hugh L. Lobdell, s. Dean Hamrick and James Monteith, Charlotte, N.C.), for respondents in No. 73-2451.
 James E. Walker and Robert G. McClure, Jr., Charlotte, N.C. (Sanders, Walker & London, Charlotte, N.C., on brief), for appellants in No. 73-2454.
 George S. Daly, Jr., Charlotte, N.C., for appellees in No. 73-2454.
 Before BOREMAN and BRYAN, Senior Circuit Judges, and WINTER, Circuit judge.
 WINTER, Circuit Judge:
 
 
 1
 When the City of Charlotte, North Carolina, proclaimed October 15, 1971 as 'Billy Graham Day' to honor one of its native sons, one of the events scheduled was a rally at the Charlotte Coliseum, a public facility capable of seating 13,000 persons. The public generally was invited and free tickets were widely distributed. In attendance was the President of the United States, and attending and securing his person in part of the premises were members of the Secret Service. Local law enforcement officials were also present, and county police, state police, the F.B.I. and others were consulted. Some members of these latter groups were active in securing presidential safety and in managing and controlling the large number of persons who attended.
 
 
 2
 As found by the district court, Sparrow v. Goodman, 361 F.Supp. 506 (W.D.N.C.1973), the events inside, including appearances and remarks by the President and Dr. Graham, proceeded without dissenting voice, sign, banner or gesture. But, as further found, certain ticket holders to the event were denied admission, or if once admitted were summarily ejected before the beginning of the program, without apparent justification. The district court found that the criteria of exclusion or expulsion were, inter alia, opposition to the war in Vietnam, advocacy of peace in Vietnam, disapproval of the President, or disapproval of the policies of his administration.
 
 
 3
 The named plaintiffs, who alleged that they were denied admission or were ejected or were arrested within or without the Coliseum either because they sought peacefully to exercise their constitutional rights by expressing their dissent from the policies of the Nixon administration and their disapproval of the President, or because they were suspected of being persons who might attempt to express such dissent or disapproval, initially brought a class action against named and unnamed members of the Charlotte police department and named and unnamed members of the Secret Service individually and in their official capacities. Joined also as defendants, but only in their official capacities, were the local prosecutor and clerk of court. Declaratory, injunctive and monetary relief were sought.
 
 
 4
 The district court first heard the case on motion for preliminary injunction and motion by the federal defendants for summary judgment. Evidence was taken and the case briefed and argued. The motion for summary judgment was denied, and the district court granted a preliminary injunction restraining defendants from
 
 
 5
 discriminatorily arresting or detaining, or keeping from the general public presence of the President, plaintiffs and others similarly situated, on account of their mode of dress or hair style, life style, peaceable expression of political (including dissenting) views, exercise of constitutional rights of free speech, petition for redress of grievances or right of association, without prior judicial authorization or without probable cause, or for any other cause not rationally necessary for the personal safety of the President.
 
 
 6
 361 F.Supp. at 587, 588. The order also directed that the action as to damages proceed. The federal, but not the state, defendants appeal the grant of the preliminary injunction and this appeal is No. 73-2454. We affirm the order granting the preliminary injunction.
 
 
 7
 Before the preliminary injunction was granted, the federal defendants moved to dismiss the complaint as to them on the ground that the district court lacked subject matter jurisdiction because the federal defendants had official immunity to suit. The motion was renewed from time to time, but ultimately denied.
 
 
 8
 In connection with discovery prior to the trial on the issue of damages, plaintiffs sought discovery by interrogatories. It was resisted on the ground that the information sought to be elicited was privileged. The interrogatories sought to discover (a) the names and addresses of all Secret Service agents at a given entrance to the Charlotte Coliseum on the day in question between given hours, (b) the names and addresses of the persons for whom a 'name check' was run, and (c) for each such person on whom a 'name check' was run, the specific information which was secured as a result of the 'name check' or otherwise. The two latter areas of inquiry were generated by testimony of the Special Agent in Charge of the Secret Service in Charlotte at the hearing on the preliminary injunction to the effect that a 'name check' may have been run on some or all of the persons who were ticket takers at the Coliseum on Billy Graham Day. The district court overruled the federal defendants' objections to these interrogatories, indicating its willingness to consider an appropriate protective order if one should be requested. Thereafter, the federal defendants sought unsuccessfully to obtain a certification for an interlocutory appeal; and when they were directed to answer these interrogatories, they filed a petition for a writ of mandamus and obtained a stay from us before the date for compliance. The petition for mandamus (No. 73-2451) prays that the writ be issued to direct the district court to dismiss the federal defendants from the suit on the ground that they are immune from suit and the controversy is moot, and, alternatively, that the orders directing them to answer the interrogatories be vacated for the reason that the discovery information sought is privileged. We conclude that the petition for issuance of the writ should be denied.
 
 
 9
 Because the petition for a writ of mandamus (No. 73-2451) arises out of the facts and matters which are the subject of the appeal (No. 73-2454) and some of the legal issues raised in each overlap, we heard both matters together. We decide them in this single opinion.
 
 No. 73-2454
 
 10
 The federal defendants contend that the preliminary injunction should be vacated or modified with regard to them for several reasons. First, they claim that they may not be enjoined or even sued under the immunity doctrine. The federal defendant James Rowley, Director of the United States Secret Service, contends that in personam jurisdiction has not been obtained over him. All of the defendants argue that the findings of the district court that (1) the Secret Service had a plan of exclusion of persons from the Coliseum based upon the criteria enumerated by the district court, and (2) the Secret Service was in charge of the exclusion of persons that actually occurred on Billy Graham Day are both lacking in evidentiary support and, thus, clearly erroneous. They also argue that the injunction is fatally defective because the district court, in granting interim relief, failed to make a specific finding that plaintiffs were likely to prevail on the merits. Further, the federal defendants assert that the action was moot, in that there was no showing that the President would again appear publicly and speak in Charlotte and that defendants or others similarly situated would be excluded from the gathering. They assert, therefore, that the injunctive relief against future actions was not warranted. Finally, the federal defendants object to compliance with the district court's order directing them to answer certain interrogatories and to the production of certain documents sought to be inspected by plaintiffs.
 
 
 11
 A. The claim of immunity is based primarily upon the decision in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), with additional support in Gregoire v. Biddle, 177 F.2d 579 (2 Cir. 1949) (quoted and relied on in Barr); Berndtson v. Lewis, 465 F.2d 706 (4 Cir. 1972); and Galella v. Onassis, 487 F.2d 986 (2 Cir. 1973). Pertinent also to this contention is the recent Supreme Court case, decided since the argument of this appeal: Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).
 
 
 12
 Our reading of these cases persuades us that the doctrine of immunity, whatever its scope (a subject hereafter discussed), has no application to a suit for declaratory or injunctive relief, and, specifically, that it has no application to the aspect of the present litigation which resulted in the federal defendants, and others, being preliminarily enjoined from future denials of the exercise by plaintiffs of their constitutional rights. Reference to Barr and to Scheuer is sufficient to prove the point.
 
 
 13
 In Barr, damages for libel were sought to be recovered by two officers of the Office of Rent Stabilization from the Acting Director of that agency because of allegedly defamatory statements contained in a press release. The Acting Director claimed either an absolute or qualified privilege. Four justices concluded that the Acting Director had an absolute privilege and a fifth concurred in the judgment on the ground that the press release was neither unauthorized nor beyond the scope of the Acting Director's official business and he should not be liable therefor. The plurality, per Mr. Justice Harlan, in expressing the view that absolute privilege was applicable, stated:
 
 
 14
 The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties-- suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. 360 U.S. at 571, 79 S.Ct. at 1339.
 
 
 15
 Scheuer concerned a suit for damages against the Governor and other officers of the state brought by the personal representatives of students killed on the campus of a state-controlled university. In rejecting the argument that the defendants had absolute 'executive immunity' to suit, the Court had occasion to say:
 
 
 16
 The concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity. While the latter doctrine-- that the 'King could do no wrong'-- did not protect all government officers from personal liability, the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability. This official immunity apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good. 416 U.S. at 239, 94 S.Ct. at 1688, 40 L.Ed.2d at 98-99.
 
 
 17
 There two quotations demonstrate that the immunity rule, whatever its scope, is grounded upon the inhibitory effect of suits for money damages. Manifestly, actions for injunctive relief do not have that effect. The federal defendants have cited no case, and we have found none, which holds that the immunity doctrine insulates a public official or public employee from injunctive relief to prevent what would otherwise be an illegal act on his part. Scheuer states that the immunity doctrine stems from the same considerations that generated the doctrine of sovereign immunity. That immunity is embodied in the eleventh amendment, so that it is significant to note that since Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the law has been settled that, notwithstanding the eleventh amendment, in an appropriate case a state official may be enjoined by a federal court from future violation of federal law.
 
 
 18
 Thus, we conclude that the preliminary injunction is not vulnerable to the claim of official immunity.
 
 
 19
 B. Rowley contends that the district court lacked jurisdiction over his person because he has never been personally served with a copy of the summons and complaint. We are unable to determine if the contention has any merit, because Rowley neither alleged nor tendered proof to overcome the apparent regularity of the marshal's return. But, if the contention had merit, the objection has been waived and may not be asserted in this appeal.
 
 
 20
 In response to the original complaint, Rowley appeared and filed a motion to dismiss, questioning the jurisdiction of the district court over the subject matter of the action and the sufficiency of the complaint to state a claim upon which relief could be granted, but not challenging the court's jurisdiction over his person. Rule 12(b), F.R.Civ.P., provides that the defense of lack of jurisdiction over the person shall be asserted in the pleading in response to the one in which jurisdiction is claimed, or by motion in lieu of a responsive pleading, and Rule 12(h)(1) says that if a defense of lack of jurisdiction over the person is not so asserted, it is waived. Rowley does not appear seriously to contest the conclusion that his failure to assert the lack of jurisdiction over his person in his response to the initial complaint constituted a waiver of that defense, but he argues that he had a right to revive the defense because plaintiffs amended their complaint several times. His response to one of these amended complaints included a claim that the action be dismissed for lack of jurisdiction over his person. We think the argument is foreclosed, however, by the language of Rule 12(g), which states that
 
 
 21
 if a party makes a motion under this rule but omits therefrom any defense or objection then available to him which this rule permits to be raised by motion, he shall not thereafter make a motion based on the defense or objection so omitted . . ..
 
 
 22
 The leading commentators are in accord that, once having waived the defense of lack of jurisdiction over the person, as Rowley clearly did, Rule 12(g) prevents the defense from being revitalized even though plaintiffs amended their complaint and provided Rowley with an opportunity to file a new motion under Rule 12, or an answer setting forth a defense which Rule 12 would permit to be presented by motion. 2A Moore's Federal Practice P12.22, pp. 2442-43 (1974); Wright and Miller, Federal Practice and Procedure 1388, p. 845 (1969). They conclude, and we agree, that an amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading. An unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended.
 
 
 23
 C. Next, we consider the contention that the district court's ultimate findings of Secret Service participation in the exclusion of persons from the Coliseum and the criteria for exclusion were clearly erroneous. Manifestly, in deciding this issue, we must look to the record as a whole. The federal defendants gave little aid to the district court on these troublesome but important questions because, as the district court recited and the record reflects, they first sought to conceal that the Secret Service was present, 361 F.Supp. at 581; and when the presence of the Secret Service was proved by the testimony of Grimes, the Special Agent in charge of the Secret Service in Charlotte who was called as a plaintiff's witness, he refused to answer questions as to the criteria for exclusion. They give little aid to us, also, because their brief, while quoting extensively from testimony favorable to them, totally ignores evidence tending to support the district court's findings. While the record contains conflicting evidence, we think that the district court's findings are amply supported.
 
 
 24
 The starting point is the testimony of Grimes who conceded that 'plans had been made to exclude people' from the Coliseum on Billy Graham Day, although he declined to identify what people, other than to say 'those who might be suspicious,' or the criteria of exclusion. He also testified that the Secret Service agents present on the occasion wore tricolored triangular pins.
 
 
 25
 Coupled with Grimes' evidence was the testimony of several eyewitnesses who observed expulsions taking place at the Coliseum on the day of the event. A Charlotte police officer testified that he saw Secret Service agents-- identified by him from their wearing the distinctive pins-- assist 'private marshals' in excluding persons who sought admittance, and that he assisted such agents, at their request, in escorting persons from the hall. At least three of the named plaintiffs-- Mark Englander, Nancy Ferguson and Archie L. Haney, Jr.-- testified that the Secret Service-- again identified by the distinctive pin-- directed or participated in ejecting them from the premises. See summary of testimony, 361 F.Supp. at 571-573, 576. The record shows that Secret Service agents were observed engaged in many activities, and the President of the Chamber of Commerce, the sponsoring organization, testified that the Secret Service was 'in complete charge.' The record also shows the dress and hair style of these plaintiffs, as well as others, who were excluded or rejected. The record shows that each conducted himself peaceably, although some carried banners or leaflets critical of the President and the policies of his administration, or participated in chants or songs evidencing their dissent. There is no evidence that anyone was a threat to presidential security.
 
 
 26
 Since it was admitted that there was a 'plan' to exclude people-- the actual criteria of exclusion being withheld from the court by one of the federal defendants-- and since there was evidence that the Secret Service directed or participated in some expulsions, we think that the district court did not exceed the range of permissible inferences when it concluded that the plan was that of the Secret Service, that the criteria were the characteristics displayed by the plaintiffs-- in general, a disposition peacefully to manifest opposition to the President's policies-- and that the Secret Service was in charge of executing the plan. It should be remembered that the finding was made in regard to the grant of a preliminary injunction. If and when the case is reached for trial on the merits and all of the facts disclosed, it may well be that the ultimate or initial responsibility for denial of plaintiffs' constitutional rights may be found not to rest on the Secret Service. Certainly the district court has not foreclosed that possibility. 361 F.Supp. at 583.
 
 
 27
 D. Citing Davis v. Crown Central Petroleum Corporation, 483 F.2d 1014 (4 Cir. 1973), the federal defendants contend that the preliminary injunction must be vacated because the district court failed to find that plaintiffs are 'likely to prevail eventually on the merits.' It is true that the district court did not make the explicit finding as plaintiffs contend. But we cannot read the district court's exhaustive opinion other than as stating that conclusion implicitly. Thus, the holding in Davis was met. We do not require the recitation of a particular formula.
 
 
 28
 E. The contention of the federal defendants that the controversy is moot and that injunctive relief should have been denied as based upon the assertion that Billy Graham Day was a unique, nonrecurring occasion, not to be repeated in the foreseeable future. While we do not suppose that Charlotte, North Carolina, will again arrange public events to honor Dr. Graham in the near future, there is nothing in the record to suggest that the President of the United States is planning to cease making personal appearances before general public audiences, that the federal defendants will fail to perform their statutory duty of protecting him on such occasions, or that the plaintiffs or others similarly situated will not seek admission to future general public meetings for the purpose of exercising rights protected by the first amendment. We take judicial knowledge of Butler v. United States, 365 F.Supp. 1035 (D.Hawaii 1973), in which it appears that when President Nixon arrived at Hickam Air Force Base on April 30, 1972, approximately one-half year after Billy Graham Day, to meet the President of Japan, who was scheduled to arrive later in the day, numerous protesters sought to exercise their first amendment rights and alleged that they were arbitrarily excluded from the base, notwithstanding that the public generally was invited to be present.
 
 
 29
 In Lankford v. Gelston, 364 F.2d 197 (4 Cir. 1966), we held that, where there was proof of a massive violation of civil rights by the Baltimore City police, the district court abused its discretion not to have enjoined future violations of those rights even though the likelihood of a future violation was probably foreclosed because of subsequent administrative action. The case at bar is not as aggravated as Lankford, but certainly the district court had discretion to decide whether injunctive relief was appropriate. We cannot say that it abused that discretion in concluding that interim injunctive relief was proper under the state of the record which we have described.
 
 
 30
 F. The federal defendants' objections to answering interrogatories is raised also as an alternate ground for relief in their petition for a writ of mandamus and they will be considered later in the opinion. While the federal defendants also contend that they should not be required to produce certain documents that plaintiffs seek to inspect, plaintiffs' motion for the production of documents has not been ruled on by the district court. It is therefore not yet before us and we express no view on the question.
 
 
 31
 In sum, therefore, we see no reason to disturb the preliminary injunction granted by the district court. Its order is affirmed.
 
 No. 73-2451
 
 32
 In their petition for a writ of mandamus, the federal defendant seek to require the district court summarily to dismiss the suit as to them on the ground of their absolute immunity to suit. Alternatively, they seek reversal of the district court's order requiring them to answer the interrogatories described above on the ground that the information sought to be elicited was privileged. Plaintiffs do not question the appropriateness of mandamus to obtain appellate review of both of these issues; nor do we. The right to be free from suits seeking to impose liability in damages would be irretrievably lost if interlocutory review of the denial of the federal defendants' motion for dismissal were not available at this stage of the proceedings. Similarly, their claim that the information, which the district court ordered them to produce, is privileged, could not subsequently be presented for appellate review except by way of an appeal from a contempt citation. Since such an appellate remedy is hardly 'adequate,' mandamus is an appropriate method of obtaining review of the district court's discovery order. See Nixon v. Sirica, 487 F.2d 700, 707 (D.C.Cir. 1973); see also 9 Moore's Federal Practice, PP110.13(2) and 110.28. We proceed to consideration of the contentions on their merits.
 
 
 33
 A. The decision in Scheuer controls the present disposition of the federal defendants' claim of immunity. We have held that 'although Scheuer involved a suit against state executive officers, the court's discussion of the qualified nature of executive immunity would appear to be equally applicable to federal executive officers.' States Marine Lines, Inc. v. Shultz, 498 F.2d 1146, 1159 (4 Cir., 1974).
 
 
 34
 In Scheuer, the Court held that official immunity for executive officers is qualified and dependent upon the discretion and responsibility of the individual officer as viewed in relation to the act in question:
 
 
 35
 (A) qualified immunity is available to officers of the executive branch of Government, the variation dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords bases for qualified immunity of executive officers for acts performed in the course of official conduct.
 
 
 36
 416 U.S. at 247, 94 S.Ct. at 1692, 40 L.Ed.2d at 103. In Scheuer, the Court reversed the summary dismissal of a suit against the Governor of Ohio, the President of Kent State University, and the Adjutant General and various unnamed members of the Ohio National Guard brought by the personal representatives of three students killed at Kent State University in May, 1970, 'because . . . the absence of a factual record, does . . . (not) permit a determination as to the applicability of the foregoing principles to the respondents here.' 416 U.S. at 249, 94 S.Ct. at 1693, 40 L.Ed.2d at 104. So, too, we think that the claim of immunity in the case at bar is premature. Its application depends upon a determination of all of the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based, and those circumstances have not yet been fully developed. The hearing on the preliminary injunction was fairly extensive, but it cannot be said that it considered all of the circumstances relating to the plaintiffs' alleged denial of their constitutional rights. Until all are known, the determination of whether the federal defendants are immune to suit should not be made.
 
 
 37
 To give an example of undeveloped, possibly relevant facts: subsequent to entry of the preliminary injunction, there was disclosed a memorandum dated October 14, 1971, from Roland H. Walker to H. R. Haldeman, a presidential assistant, in connection with Billy Graham Day at Charlotte, North Carolina. The memorandum recites that violence and obscenities are anticipated to be experienced at the forthcoming public event; the memorandum suggests a method of controlling demonstrators outside of the Coliseum, a system for excluding them from the inside, and also a plan to establish a volunteer legal corps to handle legal questions that might arise as a result of denying entrance on the ground of an allegedly counterfeit ticket. The memorandum requests advice as to whether the plan to prevent demonstrators from entering the Coliseum should be pursued, and there is an affirmative endorsement purportedly by Mr. Haldeman.
 
 
 38
 Plaintiffs urged that we consider the memorandum in connection with the propriety of granting a preliminary injunction as against the contention of the federal defendants that the case is moot. This we have declined to do, since the memorandum was not in evidence before the district court. We cite it, however, not to accept as proved the truth of the statements it contains, but to illustrate the necessity of a full exploration of the facts before dismissal on the ground of immunity is warranted. Additionally, the reticence of the Secret Service to disclose its role in the events of Billy Graham Day has been noted. The reasons, as yet unrevealed, which may have moved the Secret Service to participate in any of the exclusions from the Coliseum here at issue could be crucial to defendants' entitlement to qualified immunity. If and when full disclosure is made, the contours of the claim of immunity will be delineated.
 
 
 39
 B. The federal defendants contend that, if they are required to provide the names and addresses of all Secret Service agents who were present at the entrance to the Coliseum during the time that plaintiffs were excluded on Billy Graham Day and the names and addresses of the persons who were to serve as marshals and upon whom a 'name check' was run, and to reveal whatever specific information that was learned about such persons as a result of the check, the operations of the Secret Service in protecting the President would be impaired. They do not, however, allege specific reasons why providing this information would have this effect. The nature of the questions and the information sought to be elicited are such that we have considerable doubt that, if the interrogatories are answered, the operations of the Secret Service in protecting the President would be impaired. We do not, of course, decide that question at this time, but we readily conclude that the federal defendants have not even attempted to demonstrate that, in fact, the danger exists. At most, they state a conclusion which we do not accepts as binding. As a general rule:
 
 
 40
 . . . the courts have repeatedly asserted that the applicability of the privilege is in the end for them and not the Executive to decide.
 
 
 41
 Nixon v. Sirica, 487 F.2d 700, 713 (D.C.Cir. 1973). See also United States v. Reynolds, 345 U.S. 1, 8, 73 S.Ct. 528, 97 L.Ed. 727 (1953); A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111, 1117-1118 (1969).
 
 
 42
 In ordering the federal defendants to answer the interrogatories, the district court stated its willingness to consider a protective order if one should be requested. Instead, the federal defendants sought an interlocutory appeal, but the district court declined to sign the necessary certification. If the danger of disclosure is as great as the federal defendants conclusorily allege, the appropriate course for them to follow is to move for entry of a protective order, showing the reasons therefor, and to ask the district court to make an in camera inspection and determination of whether their fears are well founded.
 
 
 43
 Courts appropriately examine a disputed item in camera, even though this necessarily involves a limited intrusion upon what ultimately may be held confidential, where it appears with reasonable clarity that some access is appropriate, and an in camera inspection is needed to determine what should and what should not be revealed.
 
 
 44
 Nixon v. Sirica, 487 F.2d 700, 720 (D.C.Cir. 1973) (per curiam).
 
 
 45
 In sum, we do not decide that privilege may not be applicable, but we do decide that the claim of privilege, as well as the claim of immunity, is premature.
 
 
 46
 No. 73-2454, affirmed.
 
 
 47
 No. 73-2451, petition for writ denied.