James B. WRIGHT, on behalf of himself and all others similarly situated

v.

NATIONAL ARCHIVES AND RECORDS SERVICE et al.

Civ. No. 73–362–Y.

United States District Court, D. Maryland.

Jan. 24, 1975.

Donald S. Burris, Chevy Chase, Md., David A. Jones, William S. Moore, Washington, D. C., for plaintiff.

Thomas L. Crowe, Asst. U. S. Atty., Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge:

The plaintiff, a black federal employee, seeks damages and equitable re-

lief against the General Services Administration (GSA), two of its subdivisions, the Acting Administrator of GSA and six other GSA employees alleging that he is the victim of racial discrimination in his employment relationship with the defendants. The plaintiff filed a complaint with GSA pursuant to Title VII of the Civil Rights Act of 1964 as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16 (Supp. II 1972). After nearly a year of administrative investigation and hearings, the plaintiff received an adverse ruling, and he now seeks a *de novo* trial of his complaint. To that end, he argues that his cause of action springs from three different sources: 42 U.S.C. § 2000e–16, 42 U.S.C. § 1981, and the Due Process Clause of the Fifth Amendment. He maintains that jurisdiction over the Title VII claim exists by virtue of 42 U.S.C. § 2000e–5(f)(3) and over the section 1981 and Fifth Amendment actions through 28 U.S.C. §§ 1331 and 1343 (there being more than $10,000 allegedly at issue).

The defendants have answered and move for summary judgment, urging first that this Court lacks subject matter jurisdiction over the section 1981 and Fifth Amendment claims because of the federal government's sovereign immunity. Their second argument is that the facts alleged in the complaint occurring prior to the 1972 amendments to Title VII cannot be considered by this Court and therefore that the complaint states no claim for which relief can be granted insofar as the Title VII action is concerned. Thirdly, the defendants maintain that even if Title VII will support the plaintiff's claim, only review of the administrative record is permissible and that such review requires affirmation of the administrative findings.

The plaintiff's case is pled with much skill and no little ingenuity. It is designed to proceed on two separate but parallel levels. On the one hand, there is the Title VII cause of action created by the 1972 amendments. The plaintiff has exhausted his administrative remedies and made a timely filing as required by section 2000e–16. The plaintiff maintains that even those alleged discriminatory acts which occurred before the effective date of the 1972 amendments may be considered, thereby assuring himself of an actionable claim, and that the Act, as amended, gives him a right to a de novo trial in this Court. The section 1981 and Fifth Amendment cause of action [1] is the second level of the complaint, and it is included to provide a backstop for the Title VII cause. Assuming a ruling against his Title VII argument on any given point, the plaintiff argues that he has an independent cause of action by virtue of section 1981 and the Fifth Amendment which can plug any holes in his Title VII argument.

▄▄▄  Plaintiff's Title VII theory and defendants' attack upon it can be resolved easily. The allegedly discriminatory incidents of which the plaintiff complains began in April of 1970 when he entered the Archives Specialist Training Program. It is plaintiff's contention that he continues to be a victim of racial discrimination up to the present time. The defendants would

---

1. The Fifth Amendment is said to give rise directly to a cause of action on the theory of Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Similar theories have been advanced in two Fifth Circuit cases. *See* Penn v. Schlesinger, 490 F.2d 700, 702 n. 7 and accompanying text (1973), rev'd on other grounds, 497 F.2d 970 (5th Cir. 1974) (en banc); Blaze v. Moon, 440 F.2d 1348, 1349 (5th Cir. 1971). While a

strong argument can be made that the Fifth Amendment will, in and of itself, support an action against federal officials for racial discrimination, the nature of such an action would appear to be identical to that created by § 1981. *Cf.* Penn v. Schlesinger, 490 F. 2d 700, 702 n. 7 and accompanying text (5th Cir. 1973); Blaze v. Moon, 440 F.2d 1348, 1349 (5th Cir. 1971). Since it does appear that § 1981 could support a cause of action here, *see* note 9 *infra* and accompanying text, the Fifth Amendment and § 1981 complaints will be treated as one.

have this Court close its eyes to all alleged discriminatory incidents occurring before the March 24, 1972 effective date of the 1972 amendments. This claim is without merit. The Fourth Circuit has definitively held that pre-March 1972 incidents such as those upon which the plaintiff relies may be considered in actions brought under amended Title VII. *See* Koger v. Ball, 497 F.2d 702 (4th Cir. 1974). Having stated a good Title VII cause of action, the plaintiff's next hurdle is the defendants' contention that he is not entitled to a *de novo* trial. While there are commentary and cases to the contrary,[2] the position of this Court is that no *de novo* trial is required under U.S.C. § 2000e–16 and that review is limited to the administrative record. *See* Handy v. Gaylor, 364 F.Supp. 676 (D.Md.1973). *Handy* finds considerable support in the reported decisions of other districts[3] and requires no further amplification here.

The second string on the plaintiff's bow causes more difficulty. The plaintiff's argument is that section 1981 and the Fifth Amendment give him a cause of action independent of any cause of action he may have under Title VII. Plaintiff's attempt to provide a fall-back position should this Court find that no cause of action was stated under Title VII was unnecessary in the wake of *Koger*. Nonetheless, this approach cannot be written off immediately as well-intentioned redundancy. The plaintiff maintains that he is entitled to a *de novo*

hearing. On the basis of *Handy*, this Court is compelled to rule against him, at least insofar as his Title VII theory of the case is concerned. The troublesome question left open, a question not explored in the briefs, is the consequence, if any, of plaintiff successfully stating a cause of action on his section 1981 theory to the *de novo* trial issue.

The chief hurdle confronting the plaintiff before he can succeed with the second approach to his case is the doctrine of federal sovereign immunity. Prior to the Supreme Court's decision in District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), and the 1972 amendments to Title VII, it was thought by the courts[4] and Congress[5] alike that sovereign immunity effectively kept federal employees out of federal court with regard to employment discrimination complaints, even though before *Carter* or section 2000e–16 the Fifth Circuit found a way around the sovereign immunity of the federal government through an action in the nature of mandamus. *See* Beale v. Blount, 461 F.2d 1133 (5th Cir. 1972).[6] Congress reacted with the compromise procedure set forth in section 2000e–16, opening the federal district courthouse door but limiting review to the administrative record. *See* Pointer v. Sampson, 62 F.R.D. 689, 692–694 (D.D.C.1974); Hackley v. Johnson, 360 F. Supp. 1247, 1250–1252 (D.D.C.1973). In *Carter*, however, the Supreme Court declared that section 1982, which like

---

2. *See, e. g.,* Carreathers v. Alexander, 7 CCH Emp.Prac.Dec. ¶ 9379 (D.Colo. April 24, 1974); Henderson v. Defense Contract Administration Services Region, 370 F.Supp. 180, 183 (S.D.N.Y.1973); Sape & Hart, Title VII Reconsidered, 40 Geo.Wash.L.Rev. 824, 857 (1972).

3. *See, e. g.,* Roney v. Saxbe, 380 F.Supp. 1191 (D.D.C.1974); Pointer v. Sampson, 62 F.R.D. 689, 691–696 (D.D.C.1974); Baca v. Butz, 376 F.Supp. 1005, 1006–1010 (D.N.M. 1974); Spencer v. Schlesinger, 374 F.Supp. 840, 844 (D.D.C.1974); Tomlin v. United States Air Force Medical Center, 369 F. Supp. 353, 356 (S.D.Ohio 1974); Hackley v.

Johnson, 360 F.Supp. 1247, 1252 (D.D.C. 1973).

4. *See, e. g.,* Blaze v. Moon, 440 F.2d 1348 (5th Cir. 1971); Gnotta v. United States, 415 F.2d 1271 (8th Cir. 1969).

5. *See* H.R.Rep.No.92–238, as reported in 2 United States Code Congressional & Administrative News, 92d Cong., 2d Sess. 2137, 2160 (1972).

6. Use of the mandamus approach to the problem was criticized in a student note. *See* Note, Exhaustion of Remedies Under § 1981, 41 Geo.Wash.L.Rev. 657, 663 (1973).

section 1981 is derived from section 1 of the Civil Rights Act of 1866,[7] applied to racial discrimination "private as well as public, *federal* as well as state." 409 U. S. at 422, 93 S.Ct. at 605 (emphasis added). The relationship between sections 1981, 1982 and Title VII is well developed with regard to private discrimination,[8] but the ramifications of that relationship in the wake of *Carter*

have not been fully explored where federal employment is concerned. Recent decisions in the Fifth and Seventh Circuits suggest that section 1981 is not, in and of itself, a waiver of federal sovereign immunity but that the sovereign immunity barrier may indeed be breached by a section 1981 action if certain conditions are met.[9]

7. *See* Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 439 n. 11, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). For a discussion of the legislative history of § 1981, *see* Sape & Hart, *supra* note 2, at 853–857 (1972); Note, Is Section 1981 Modified by Title VII of the Civil Rights Act of 1964?, 1970 Duke L.J. 1223, 1223–26 (hereinafter cited as "Duke Note"); Note, Section 1981 and Private Discrimination, 40 Geo.Wash.L. Rev. 1024, 1025–31 (1972) (hereinafter cited as "Private Discrimination").

8. For over 100 years § 1982 had been interpreted to require some form of state action before its provisions could be utilized. *See* Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1385 (4th Cir.) (Dupree, D. J., dissenting), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Larson, The Development of Section 1981 as a Remedy for Racial Discrimination in Private Employment, 7 Harv.Civ.Rights—Civ.Lib.L.Rev. 56, 57 n. 6 and accompanying text. In Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), however, the Supreme Court declared that § 1982 was derived from the Thirteenth Amendment and applied to private individuals as well as to the states. Since §§ 1982 and 1981 share a common ancestry (*see* note 7 *supra*), the Fourth Circuit quickly determined that, on the strength of *Jones*, § 1981 creates a cause of action for employment discrimination against private individuals. *See* Scott v. Young, 421 F.2d 143, 145 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). Other circuits went even further, adopting what has become the majority rule that § 1981 creates a cause of action for private employment discrimination independent of Title VII, *i. e.*, no exhaustion of other remedies is required. *See* Johnson v. Railway Express Agency, Inc., 489 F.2d 525, 531 (6th Cir. 1973); Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 996 (1973); Brady v. Bristol-Meyers, Inc., 459 F.2d 621, 623–624 (8th Cir. 1972); Caldwell v. National Brewing Co., 443 F.2d 1044, 1046 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); Young v. International Telegraph & Telephone Co., 438 F.2d 757, 763 (3d Cir. 1971).

While the construction of § 1981, viewing it as an action independent of Title VII, was disapproved by early commentators, *see, e. g.*, Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1202 n. 46 (1971), and is opposed by the Seventh Circuit, which requires an excuse for failure to exhaust Title VII remedies, *see* Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476, 487 (7th Cir.), cert. denied, 400 U.S. 911, 91 S. Ct. 137, 27 L.Ed.2d 151 (1970), the majority construction appears to have been approved by Congress when it adopted the 1972 amendments to Title VII. *See* Sape & Hart, *supra* note 2, at 887; Private Discrimination, *supra* note 7, at 1040 n. 91; *cf.* Alexander v. Gardner-Denver Co., 415 U.S. 36, 48 n. 9, 94 S.Ct. 1011, 39 L.Ed.2d 147 and accompanying text (1974).

9. The Fifth Circuit approach to the sovereign immunity problem was first expressed in *Beale*. *See* note 6 *supra* and accompanying text. There the Fifth Circuit held that in order to avoid the jurisdictional barrier of sovereign immunity, a specific jurisdictional grant from Congress was required. *See* 461 F.2d at 1137. By implication, the *Beale* court found that § 1981 in and of itself did not constitute a waiver of federal sovereign immunity. Instead it noted that actions for improper discharge of a federal employee can be brought by a petition for a writ of mandamus which is not subject to the sovereign immunity defense. *See* 461 F.2d at 1137. The mandamus approach did not modify the traditional rule in mandamus cases that administrative remedies had to be exhausted before a mandamus petition would lie. *See* 461 F.2d at 1139.

The Fifth Circuit's position has grown somewhat less clear in the wake of the Penn v. Schlesinger litigation. The original *Penn* decision, 490 F.2d 700 (5th Cir. 1973), seemed to suggest that an action for a declaratory judgment could be brought against federal officials under § 1981 through the court's § 1343 jurisdiction, where the relief sought was more like that of mandamus than injunctive relief and where the plaintiff

Even assuming that the plaintiff can side-step the sovereign immunity problem, he does not thereby succeed in creating an alternate route to *de novo* trial. Only one circuit has considered the relationship between Title VII and section 1981 insofar as employment discrimination complaints against the federal government are concerned. In an en banc decision, Penn v. Schlesinger, 497 F.2d 970 (5th Cir. 1974), rev'g, 490 F.2d 700 (1973), the Fifth Circuit concluded that exhaustion of Title VII administrative remedies is required even where the plaintiff successfully skirts sovereign immunity with a section 1981 action. An exhaustion requirement returning plaintiff to his Title VII reme-

dies, if applied to this case, brings the present plaintiff full circle, for he has exhausted his administrative remedies. His remaining Title VII hope for relief lies in judicial review, which this Court has already held is limited to review of the administrative record rather than trial *de novo*. Adopting the Fifth Circuit construction of the relationship between Title VII and section 1981 in federal employment discrimination cases also preserves the legislative compromise originally perceived by this Court in construing the judicial review provisions of the 1972 amendments to Title VII. Congress could have provided for *de novo* review when it enacted those amendments. It did not, and this Court

had an excuse for failing to exhaust his administrative remedies. The theory of the first *Penn* case was that federal officials who acted ultra vires, and hence came within the exception to the doctrine of sovereign immunity of Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and Larson v. Domestic & Foreign Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), were subject to suit. The exhaustion requirement was borrowed from *Beale*'s mandamus rationale. When the Fifth Circuit, sitting en banc, reversed *Penn I*, it adopted as its opinion the dissenting opinion of Judge Godbold in *Penn I*. *See* 497 F.2d 970, 971 (5th Cir. 1974). Judge Godbold was primarily concerned with the exhaustion problem. It is not altogether clear that he adopted the majority opinion in *Penn I* that § 1981 created a cause of action against federal officials for ultra vires discrimination. *See* 490 F.2d at 713–714. Judge Tuttle in his dissent to the majority position in *Penn II* assumes that Judge Godbold *did* accept the ultra vires theory. *See* 497 F.2d at 974. Judge Tuttle would have gone beyond the position he took in *Penn I* to adopt a no-exhaustion position in § 1981 actions and also to permit a § 1981 action for damages and injunctive relief as well as the limited declaratory action permitted in *Penn I*. See 497 F.2d at 975. Thus the Fifth Circuit at present appears to have adopted two routes around sovereign immunity in § 1981 cases: (1) Mandamus plus exhaustion as outlined in *Beale* and more recently in Petterway v. Veterans Administration Hospital, 495 F.2d 1223 (5th Cir. 1974), and (2) Limited declaratory judgment plus exhaustion against federal officers acting ultra vires as was apparently adopted in *Penn II*. In addition there is the minority

position that § 1981 gives a cause of action for damages, equitable relief, and declaratory relief against federal officers acting ultra vires.

The Seventh Circuit suggests yet another way around federal sovereign immunity. In a footnote to *Beale*, the Fifth Circuit noted that the Supreme Court held in Federal Housing Administration v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940) and Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939), that a "sue or be sued" clause in a federal agency's authorizing legislation creates a specific waiver of sovereign immunity. *See* 461 F.2d at 1137 n. 6. The court in *Beale* declined to consider the implications of such a clause in *Beale*, but the Seventh Circuit took up the problem in Baker v. F & F Investment Co., 489 F.2d 829 (7th Cir. 1973). Citing *Burr* and *Keifer*, the Seventh Circuit held that federal agencies as well as federal officers are liable both for damages and equitable relief where the federal government has waived its sovereign immunity through a sue or be sued clause. *See* 489 F.2d at 833–834.

The Fourth Circuit's position in this area is not clear. The rule in this Circuit is that federal officials acting ultra vires are subject to suit. *See* Rowley v. McMillan, 502 F.2d 1326, 1335–1336 (4th Cir. 1974). The Fourth Circuit also has held that a sue or be sued clause constitutes a waiver of sovereign immunity. *See* White v. Bloomberg, 501 F.2d 1379, 1384 n. 6 (4th Cir. 1974); Ferguson v. Union Nat'l Bank, 126 F.2d 753, 759 (4th Cir. 1942). No sue or be sued clause has been brought to the attention of the Court in this case, however, so the Seventh Circuit approach need not be considered.

will not upset that Congressional judgment.[10]

One question remains to be answered before reaching the merits—what standard of review should be applied to the administrative record? The plaintiff makes much of what he views as a significant discrepancy between the standard of review prescribed by Judge Gesell in Hackley v. Johnson, 360 F.Supp. 1247 (D.D.C.1973) and that set forth by Chief Judge Northrop in *Handy*. Judge Gesell suggested that "[i]f [the District Court] determines that an absence of discrimination is affirmatively established by clear weight of the evidence in the record, no new trial is required." 360 F.Supp. at 1252. Chief Judge Northrop, on the other hand, suggested that the scope of judicial review is fully exhausted when the administrative record discloses "substantiality in the support for the administrative findings." 364 F.Supp. at 679 *quoting* Halsey v. Nitze, 390 F.2d 142, 144 (4th Cir.), cert.

denied, 392 U.S. 939, 88 S.Ct. 2316, 20 L.Ed.2d 1399 (1968). While the distinction plaintiff is attempting to draw may well be more apparent than real, it need not be explored by this Court, since, under either formula, the record provides sufficient support for the agency determination.

■ The plaintiff began his employment with the General Services Administration in 1957 at the GS–3 level. By 1968, he had reached the position of Office Services Aide, GS–6. The plaintiff's complaint concerns his experience from April 19, 1970 to April 5, 1972 when he was a trainee in the National Archives and Record Service Archives Specialist Training Program.

As originally instituted, the training program required a college degree and eligibility as determined by the Federal Service Entrance Examination. In December of 1969, however, the agency dropped those two requirements in an effort to recruit agency-employed appli-

10. A strong case can be made against requiring exhaustion. *See* Penn v. Schlesinger, 497 F.2d 970, 974–976 (Tuttle, J. dissenting). Indeed, as the dissenters point out in *Penn II*, exhaustion, if required in § 1981 actions brought against federal officers, would be a requirement unique to federal § 1981 actions as opposed to civil rights actions against private parties or state officials. The Fifth Circuit argued in *Beale* that good reason exists for treating federal actions differently. *See* 461 F.2d at 1139; *cf.* Baca v. Butz, 376 F.Supp. 1005, 1007–09 (D.N.M.1974). An exhaustion requirement, however, goes hand-in-hand with the "no de novo" trial conclusion previously reached by this Court and others, *see* note 3 *supra* and accompanying text, in interpreting Title VII. If exhaustion of available administrative remedies, *i. e.*, Title VII remedies, is required before a civil rights action for alleged employment discrimination can be brought against the Federal Government or one of its officials, then the integrity of the procedures established by Congress for reviewing such complaints will be maintained. On the other hand, if District of Columbia v. Carter, 409 U.S. 418 (1973), is coupled with the recently constructed routes past federal sovereign immunity, a complaining federal employee will be given two bites of the apple when Congress thought he had none prior to its 1972 action. He may pursue his com-

plaint administratively under Title VII and then, finding the door to *de novo* review blocked by decisions like *Handy* and *Hackley*, walk through a second door to the courthouse with an original civil rights action. If Congress did not intend *de novo* review under Title VII, it is difficult to believe that, insofar as federal employees are concerned, it contemplated original actions brought pursuant to § 1981 and/or the Fifth Amendment.

During 1974 there were at least four reported district court decisions in actions brought by federal employees pursuant to Title VII and § 1981 alleging employment discrimination. *See* Willingham v. Lynn, 8 CCH Emp.Prac.Dec. ¶ 9618 (E.D.Mich. June 18, 1974); Baca v. Butz, 376 F.Supp. 1005 (D.N.M.1974); Spencer v. Schlesinger, 374 F.Supp. 840 (D.D.C.1974); Ficklin v. Sabatini, 378 F.Supp. 19 (E.D.Pa.1974). In *Willingham*, the court found that a § 1981 action would not penetrate the federal sovereign immunity barrier. *See* 8 CCH Emp. Prac.Dec. at 5654. The issue was not really discussed in *Spencer* and *Baca*, but in *Ficklin* the court used the Seventh Circuit approach to side-stepping sovereign immunity. *See* 378 F.Supp. at 829. *Ficklin* did not, however, take up the exhaustion problem or explore the relationship between Title VII and an independent cause of action under § 1981 with regard to *de novo* trial.

cants as part of its Equal Employment Opportunity Affirmative Action Program. The plaintiff decided to take advantage of that program in April 1970, agreeing to accept a one-grade demotion to GS–5 to do so.

The program was to last two years, with promotion to GS–7 after successful completion of the first year and promotion to GS–9 after completion of the second year. The plaintiff successfully completed his first year and was promoted to GS–7. His work was deemed unsatisfactory at the conclusion of his second year, and he was offered a 90-day extension of his training period, as per the training agreement, to give him an opportunity to prove that he could perform at the requisite level. The plaintiff declined the offered extension and was withdrawn from the program.

Charging that his withdrawal was racially motivated, he filed an Equal Employment Opportunity Complaint on April 10, 1972. The agency conducted an investigation of his complaint in May and June, and concluded in a letter dated September 22, 1972, that there was no evidence to support Wright's charges. On October 11, 1972, the plaintiff requested a hearing. Two days of hearings were held by an EEO Complaints Examiner, who issued a report finding no discrimination. On the basis of that report, GSA issued its decision of no discrimination which Wright now appeals to this Court.

The EEO Examiner characterized his inquiry as one of determining whether the agency discriminated against the plaintiff due to his race in extending his training for 90 days and then dropping him from the program when he refused to accept the extension. The plaintiff's complaint, as noted by the Examiner, contended that black trainees received more difficult assignments and less instruction, training opportunities and supervision than their white counterparts. He also charged that seating arrangements for the trainees were segregated.

With regard to his withdrawal, the plaintiff argued that he was unfairly surprised by the unfavorable evaluations of his work which came at the end of his training period and that he was thereby deprived of an opportunity to demonstrate his true potential. Implicit in this charge is an allegation that the unfair surprise was designed to exclude the plaintiff and that white trainees were not similarly disadvantaged.

While the Examiner found some evidence that early in the plaintiff's training cycle a white supervisor may have given more supervision to a white trainee than to the blacks that were under her supervision, he determined that this higher degree of supervision was not racially motivated. His conclusion finds ample support in the record. Furthermore, when the black trainees' misgivings about their supervisor were brought to the attention of higher level management, she was relieved of her trainee supervision responsibilities.

As to the general charges on assignments and supervision, the Examiner also found no evidence of racial bias, and again the record supports his conclusions. There is considerable testimony and other evidence in the record having to do with the race of members of a Special Projects unit at the Center. While black trainees did not participate in the unit for several months, there is nothing in the record to justify a conclusion that their exclusion was race-related, and, again, management took action to make the program available to the black trainees when it became aware of their concern.

Turning to the seating arrangements, the Examiner found that the seating of the black trainees in one cubicle was not racially motivated, though it was unwise. Again, when higher level management became aware of the possible connotations of the seating arrangements, those arrangements were changed.

The real focus of the investigation and report is on the facts and personali-

ties involved in the decision to extend the plaintiff's training period, his subsequent refusal to accept that extension, and his withdrawal from the program. There is evidence that with the arrival of Forest Williams, the training program took on a new direction, and its standards acquired new rigor. There is also evidence that prior to Williams' assuming the manager's position, effective guidance of the trainees, black and white, was minimal. Indeed, there does appear to be support for a conclusion that after the Wright incident, the counselling and evaluation aspects of the training program received greater emphasis and sensitivity. Nonetheless, Williams' effect on the program does not support a conclusion of racial bias. The record suggests that Williams is a man of high standards, capable of setting concrete goals for his organization, and a manager sensitive to racial problems. To adopt the Examiner's phrase, the training program was a "rudderless entity" when Williams arrived. He may indeed have applied a firm hand to the helm, but the evidence simply will not support a conclusion that his choice of direction was motivated by racial considerations, conscious or otherwise. It would appear that Williams and the other members of the evaluation panel, as well as Williams' superiors, were well aware of the weaknesses of the training program and the potential trauma that could result from an unsatisfactory rating to a trainee. The offered 90-day extension does not appear to have been pro forma window dressing but rather a genuine attempt to give Wright, and others similarly situated, the opportunity to prove themselves, an opportunity designed to assure fair and complete consideration. It was Wright's failure to accept the offer, not racial discrimi-

nation, that brought about his failure to complete the training program successfully.

When the black trainees showed deficiencies in their writing ability, they were steered to a program designed to improve their writing skills. When the black trainees objected to the attitude of a white supervisor, the agency removed that supervisor. When seating patterns caused concern, those patterns were changed. When the discontent of the black trainees with their failure to be included in the Special Projects unit became known, they were included. When, following the Wright evaluation, inadequacies as to guidance and supervision of the trainees became apparent, those inadequacies were remedied. The decision to extend Wright's training period, far from reflecting racial bias, is part of a pattern of agency concern for its minority employees. It is but another example of the Center's efforts to go the extra mile.

In dealing with the delicate, emotion-laden issue of racial discrimination in employment practices, the Court must be sensitive to the rights of minority employees and to the difficulties inherent in attempts to stamp out racial bias. The record strongly suggests that the plaintiff's case has been a source of deep pain for the defendant parties as well as the plaintiff. Both sides made mistakes, but those mistakes do not make out a case of racial discrimination. Applying the standards of Judges Gesell and Northrop respectively, the record here affirmatively established by the clear weight of the evidence [11] an absence of discrimination and "substantiality in the support for the administrative findings" with regard to the plaintiff's complaint. Indeed, the record affirmatively estab-

---

11. The plaintiff's claim that the Examiner's findings are without adequate support in the record is without merit. So, too, is his argument that the Examiner failed to make findings which should have been made. No two fact-finders dealing with an inquiry into a two-year pattern of employment practices will give the same degree of emphasis to the questions that emerge during the course of that inquiry. The plaintiff would have emphasized some questions more than did the Examiner. This Court might have chosen still a third approach. The Examiner's inquiry was full and fair, however, and his findings are sufficient for the purposes of this complaint.

lishes a laudable sensitivity to racial problems and a commitment to remedying them on the part of the key management decision-makers involved.

For the reasons stated, it is this 24th day of January, 1975, by the United States District Court for the District of Maryland, ordered:

That the defendants' motion for summary judgment be, and the same is, hereby granted.